IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31167-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOHN HENRY MARKWELL, | ) | |
| | ) | |
| Appellant. | ) | |

KULIK, J. — John Markwell appeals his convictions for three counts of second degree rape. He does not dispute that there was sexual intercourse. But he challenges the sufficiency of the evidence to support the "forcible compulsion" element of the charges. He also contends the trial court erred in admitting expert testimony and denying his motion for a mistrial and that prosecutorial misconduct and cumulative error deprived him of a fair trial. Mr. Markwell's arguments are unpersuasive. Accordingly, we affirm his convictions.

## FACTS

Between July 20, 2011, and August 13, 2011, John Henry Markwell and Charlie Dale Hopkins were both inmates at the Garfield County jail. Mr. Markwell would often

talk to inmates, including Mr. Hopkins, about prison life, his involvement in fights, and how he beat up people for snitching. Mr. Markwell is a physically imposing figure at 6'1" and 240 pounds. Mr. Hopkins, in contrast, is approximately 5'8" and 140 pounds. A number of inmates at the jail, including Mr. Hopkins, found Mr. Markwell intimidating.

Upon learning that Mr. Hopkins had been sentenced for a sex crime, Mr. Markwell told him that sex offenders in prison can expect to have their property stolen, and be attacked and beaten. He offered to help Mr. Hopkins by writing him a "letter from home," which he explained would protect him from harm while in prison. Report of Proceedings (RP) at 391. The letter stated:

> "Charlie Hopkins is an awesome homosexual that has his mind right and he deserves a fair chance and has proven himself as he has done with me.
> His mother is also my woman, so this—so this woman here is a part of my family.
> . . . Handle with care. Handle fair.
> . . . Charlie deserves to be safe and spoiled."

RP at 391. Mr. Hopkins believed he needed the letter for protection.

In August 2011, Mr. Markwell approached Mr. Hopkins demanding oral sex. Mr. Hopkins repeatedly said "no," but Mr. Markwell continued to make sexual demands. Mr. Hopkins stated that he eventually went into Mr. Markwell's cell where Mr. Markwell "force[d] me to give him oral sex." RP at 385. He explained that Mr. Markwell, "kept

2

demanding, kept demanding, he took his hand and put in on the back of my head . . . [a]nd held my head . . . on him." RP at 388. When Mr. Hopkins tried to remove his mouth from Mr. Markwell's penis, Mr. Markwell held his head in place and prevented him from removing it.

On a second occasion, Mr. Markwell asked Mr. Hopkins to rub the back of his neck. Mr. Hopkins was afraid that he would lose the protection of Mr. Markwell and therefore complied. Mr. Markwell then proceeded to pull down Mr. Hopkins's pants, even though Mr. Hopkins tried to pull them back up. Once Mr. Hopkins's pants were down, Mr. Markwell penetrated Mr. Hopkins's anus. When Mr. Hopkins complained that it hurt, Mr. Markwell ordered Mr. Hopkins to perform oral sex. Mr. Hopkins complied with the order.

The third act of sexual intercourse was oral sex. Mr. Markwell testified that he was afraid to refuse Mr. Markwell's order to give him oral sex because he feared Mr. Markwell might take back the protective letter and destroy it.

The State charged Mr. Markwell by amended information with three counts of second degree rape.

Before trial, Mr. Markwell moved to exclude the testimony of two experts, Stephen Lindsley, a licensed psychologist, and Robert Jackson, an investigator for the

3

Department of Corrections (DOC) on the basis that their testimony was irrelevant to the issue of forcible compulsion and unfairly prejudicial.

The trial court allowed both witnesses to testify, concluding that Mr. Jackson's testimony helped the jury understand prison terminology and culture and thereby assisted the jury in understanding Mr. Markwell's statements to Mr. Hopkins. As to Mr. Lindsley's testimony, the court concluded that Mr. Hopkins's psychological profile and vulnerability to manipulation was relevant to a jury's understanding of whether Mr. Hopkins's response to the alleged threats was reasonable.

At trial, Mr. Jackson testified that he is employed at Walla Walla State Penitentiary and has 19 years' experience in corrections. He explained that based on this extensive experience, he is familiar with prison culture and slang. He stated that an inmate may be referred to as a "wife" or "bitch," which means the inmate is used for sexual gratification inside the prison. RP at 243-44. He explained that the terms also implied that one of the individuals is dominant and the other submissive. According to Mr. Jackson, an inmate can be "own[ed]" by another and that there are consequences for someone who touches the "owned" person without permission. RP at 246. Mr. Jackson also testified that some inmates carry letters from inmates of a higher rank in the prison hierarchy that "vouch" for the lower ranking person. RP at 248.

4

In addition, Mr. Jackson told the jury that rapes and assaults occur within the prison and that inmates have the power to harm other inmates. Of particular significance to this case, he also testified that sex offenders are ranked at the bottom of the prison hierarchy and are more likely to be targeted for harassment and assaulted.

Mr. Lindsley, a licensed mental health counselor and sex offender treatment provider with 35 years' experience, conducted a psychosexual evaluation of Mr. Hopkins in August 2011. He testified that Mr. Hopkins was functioning in the "borderline range of intelligence" with an IQ between 70 and 84, and that, at 21 years of age, he had the emotional development of an adolescent. RP at 272. Mr. Lindsley noted that Mr. Hopkins viewed the world as a dangerous place, was not able to challenge dominant individuals, and was therefore vulnerable to manipulation. He stated that when a person is fearful, they are more likely to form a close bond with someone who can alleviate that fear.

Mr. Hopkins testified about the three sexual incidents described above. He also described the atmosphere of coercion and fear that Mr. Markwell created in the jail. He testified that prior to the three sexual incidents, Mr. Markwell had abused and threatened him, forcing him to clean his cell and yelling at him if he failed to comply. He stated that Mr. Markwell implied that he would get hurt if he did not clean. He described a specific

incident where he accidentally brushed Mr. Markwell's foot with a mop and Mr. Markwell responded by yelling to get the mop away or he would kick his head in. Mr. Hopkins also testified that Mr. Markwell claimed Mr. Hopkins was his property and told him he will do as he is told.

Mr. Markwell also told Mr. Hopkins that because he was in for a sex crime, he would be targeted by other inmates and therefore needed Mr. Markwell's protection. Mr. Markwell told him he could earn the protection through the above-referenced protection letter by becoming his "woman." RP at 393. Mr. Hopkins felt he could not decline because he "was afraid of the whole prison system" and that he would lose Mr. Markwell's protection. RP at 390. He explained that he was afraid of Mr. Markwell because he talked about beating people up for snitching. According to Mr. Hopkins, Mr. Markwell told him that if he ever snitched, his friends and family would not be safe.

Mr. Markwell controlled and dominated other inmates. He forced Michael Burke, another inmate at the jail, to move out of his cell and then ordered Mr. Hopkins into that cell with Mr. Markwell. In addition to forcing Mr. Burke to move out of his jail cell, Mr. Markwell controlled Mr. Burke with threats of physical harm. Mr. Burke described an incident where Mr. Markwell ordered him to "throw towels" or he would "'break [his] neck.'" RP at 515-16. Mr. Hopkins witnessed these threats. When asked to describe Mr.

Hopkins's behavior in the presence of Mr. Markwell, Mr. Burke testified that "[Mr. Hopkins] just seemed scared . . . [l]ike your dad yelling at you when you are a little kid." RP at 477. He also overheard Mr. Markwell telling Mr. Hopkins, "'I will kick your ass.'" RP at 477.

Following a traffic infraction, Dustin Warren spent a weekend in the Garfield County jail with Mr. Markwell and Mr. Hopkins in August 2011. He testified that his first impression of Mr. Markwell was of a "big and intimidating guy." RP at 521. He observed that Mr. Hopkins "[k]ind of shied away from [Mr. Markwell]." RP at 521. Mr. Warren also noticed that during that weekend, Mr. Hopkins "just kind of sat back and was quiet the whole time." RP at 521.

A jury found Mr. Markwell guilty of all three counts of second degree rape. The court sentenced him under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981, chapter 9.94A RCW, to life without the possibility of parole. He appeals.

## ANALYSIS

*Sufficient Evidence—Forcible Compulsion.* Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it would permit any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v.*

7

*Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.* We defer to the trier of fact, who resolves conflicting testimony, evaluates credibility of witnesses, and generally weighs the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

A person is guilty of rape in the second degree when the person "engages in sexual intercourse with another person . . . [b]y forcible compulsion." RCW 9A.44.050(1)(a). "'Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person." RCW 9A.44.010(6). Forcible compulsion does not require a showing that the victim offered physical resistance. *State v. McKnight*, 54 Wn. App. 521, 525, 774 P.2d 532 (1989). It is the conceptual opposite of consent and "requires more than the force normally used to achieve sexual intercourse or sexual contact." *State v. Ritola*, 63 Wn. App. 252, 254, 817 P.2d 1390 (1991); *see State v. Camara*, 113 Wn.2d 631, 636-37, 781 P.2d 483 (1989).

As a preliminary matter, Mr. Markwell does not dispute that there was sexual intercourse during the three incidents at issue here. What is disputed is whether the State established the essential element of forcible compulsion. Mr. Markwell, relying primarily

8

on *State v. Weisberg*, 65 Wn. App. 721, 829 P.2d 252 (1992), first contends "there was no evidence of physical force sufficient to constitute forcible compulsion." Appellant's Br. at 20. He asserts that under the totality of the circumstances, putting a hand on the back of Mr. Hopkins's head or pulling down his pants does not constitute forcible compulsion, especially in view of the fact that an "audible request for help would have sufficed to end any sexual contact." Appellant's Reply Br. at 9.

As to the second incident, Mr. Markwell points out that there was no evidence that force was used. He also states that he stopped anal intercourse as soon as Mr. Hopkins complained of pain. And Mr. Markwell contends that there was no evidence that he threatened, expressly or impliedly, to physically harm Mr. Hopkins to force him to engage in sexual intercourse.

*Weisberg* is materially distinguishable. In that case, the only evidence of forcible compulsion was an exchange between the victim and the defendant in which the victim "expressed reservations about lying down on the bed" and the defendant told her "'go ahead and lay down on the bed anyway.'" *Weisberg*, 65 Wn. App. at 725. Although the victim testified that she was frightened, there was no evidence that the defendant communicated a threat or intention to cause her bodily harm. *Id.* at 725-26.

Here, in contrast, Mr. Markwell used both physical force and implied threats of harm to force Mr. Hopkins into having sexual intercourse with him. In the first incident, Mr. Markwell persistently demanded that Mr. Hopkins perform oral sex, despite Mr. Hopkins repeatedly telling him that he did not wish to do so. Mr. Hopkins tried to remove his mouth from Mr. Markwell's penis, but Mr. Markwell held the back of Mr. Hopkins's head with such force that Mr. Hopkins was not able to pull away. And in the second incident, Mr. Markwell used physical force to remove Mr. Hopkins's pants, even after Mr. Hopkins tried to pull his pants back up.

On these facts, a jury could reasonably conclude that Mr. Markwell's physical persistence, which Mr. Hopkins verbally and physically resisted, was an implied threat that placed him in fear of physical injury and that the physical force and implied threat were the only reasons that sexual intercourse occurred.

In addition to the evidence of physical force, the State produced evidence of forcible compulsion through implied threats. To prove a "threat" under RCW 9A.44.010(6), the State must provide "some evidence from which the jury could infer that not only did [the victim] perceive a threat, but also that [the defendant] in some way communicated his intention to inflict physical injury in order to coerce compliance." *Weisberg*, 65 Wn. App. at 726.

10

The record here establishes that Mr. Markwell, through his conduct at the jail, impliedly threatened Mr. Hopkins so that he feared physical injury if he did not comply with Mr. Markwell's demands. As detailed above, Mr. Markwell created an atmosphere of fear in the jail in which he told stories of past violent acts and regularly threatened Mr. Hopkins with harm. In addition to the testimony of other inmates, detailed above, Mr. Hopkins testified that Mr. Markwell (1) threatened to harm Mr. Hopkins's friends and family if he snitched on him, (2) threatened to kick him in the head, (3) forced him to clean the jail common area and would yell and throw things if Mr. Hopkins failed to comply, (4) forced Mr. Hopkins to move into Mr. Markwell's cell and moved his personal items, (5) claimed Mr. Hopkins was his property, and (6) told him "what . . . he said was the law" and "I am his and I will do what he says." RP at 412. Finally, after writing the protective letter, he told Mr. Hopkins that he needed to "mak[e] [the letter] true." RP at 393. A juror could reasonably interpret this as an implied threat to withdraw the letter and subject Mr. Hopkins to harm if he did not give into Mr. Markwell's sexual demands. Moreover, the difference in body size between Mr. Hopkins and Mr. Markwell is relevant in assessing whether there was forcible compulsion. *See McKnight*, 54 Wn. App. at 525-26.

Viewed in the light most favorable to the State, we conclude that there is sufficient

11

evidence of forcible compulsion to support Mr. Markwell's convictions for second degree

rape.

*Expert Testimony.* Next, Mr. Markwell contends that the court erred in allowing

the State to introduce the expert testimony of Mr. Jackson and Mr. Lindsley. He contends

that Mr. Jackson's testimony was not helpful to the jury under ER 702, and that its

probative value was outweighed by its prejudice. He asserts the testimony equated Mr.

Markwell, who had previously been in prison, with prison security threats and inmates

who commit crimes within the prison system. In addition, he contends that Mr.

Lindsley's testimony should have been excluded because it improperly vouched for Mr.

Hopkins's credibility and constituted an opinion as to Mr. Markwell's guilt.

The admission of expert testimony is governed by ER 702 and requires a case-by-

case analysis. *State v. Willis*, 151 Wn.2d 255, 262, 87 P.3d 1164 (2004). ER 702 allows

an expert to testify if "specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue."

We review a trial court's determination of the admissibility of expert testimony for

an abuse of discretion. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654,

683, 15 P.3d 115 (2000). If the basis for admission is "fairly debatable," we will not

disturb the trial court's ruling. *Grp. Health Coop. of Puget Sound, Inc. v. Dep't of*

*Revenue*, 106 Wn.2d 391, 398, 722 P.2d 787 (1986) (quoting *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)). Washington appellate courts generally do not weigh expert testimony. *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993).

JACKSON TESTIMONY

As noted above, the trial court concluded that Mr. Jackson's testimony was relevant to help the jury understand Mr. Markwell's statements to Mr. Hopkins in the context of prison life. This was a tenable basis. One of the central issues in the case was whether the sexual acts occurred as a result of express or implied threats. Mr. Jackson's testimony assisted the jury in understanding prison terminology and the significance of Mr. Markwell's comments to Mr. Hopkins within the context of the prison system. As such, it helped the jury understand the State's theory of the case.

Mr. Markwell also contends that Mr. Jackson's testimony amounted to improper profile evidence because it "tended to equate Mr. Markwell, who had been in prison in the past, with security threats and those prisoners guilty of assaults, introduction of drugs and even murder—matters which Mr. Jackson testified were the matters in which he had expertise and experience." Appellant's Br. at 25. He reasons that this evidence "was used to imply that Mr. Markwell committed the charged crime because he shared the

characteristics of known offenders." Appellant's Br. at 25-26.

Generally, profile evidence that identifies a person as a member of a group more likely to commit the charged crime is inadmissible because it lacks probative value and is inherently prejudicial. *State v. Suarez-Bravo*, 72 Wn. App. 359, 365, 864 P.2d 426 (1994) (quoting *United States v. Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988)); *State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992). Here, when asked to describe his professional background, Mr. Jackson testified that he had worked for the DOC for 19 years and that during that time, he had been employed as a correctional mental health counselor, corrections specialist and, most recently, as the chief investigator of the intelligence and investigations unit at Walla Walla State Penitentiary. He explained that his current position involves the investigation of criminal activity within the prison, which could include anything "from assaults, drug introductions, attempted murders, and so on." RP at 233.

Mr. Jackson's recitation of his professional credentials does not constitute profile evidence. There was no testimony that Mr. Jackson had even investigated Mr. Markwell. His work history was simply introduced to explain why he was knowledgeable about prison culture, not to create an inference that Mr. Markwell had a propensity to commit crimes. The trial court properly admitted Mr. Jackson's testimony.

14

LINDSLEY TESTIMONY

Mr. Markwell next contends that Mr. Lindsley's testimony should have been excluded as improper vouching and an impermissible opinion as to guilt. He argues, "[t]he sole purpose of [Mr. Lindsley's] testimony was to give the jurors Mr. Lindsley's expert opinion that Mr. Hopkins was vulnerable, credible and a victim; and, by inference, that Mr. Markwell was guilty of victimizing him." Appellant's Br. at 26.

The trial court admitted Mr. Lindsley's testimony as relevant to the issue of whether the sexual acts occurred as a result of an express or implied threat, reasoning, "the issue of [Mr. Hopkins's] vulnerability to exploitation . . . is relevant to the jury understanding and determination of whether or not his subjective response to the alleged, implied or expressed threats from the defendant were objectively reasonable." RP at 48.

It is generally improper for a witness to opine that the defendant is guilty; to do so invades the province of the jury. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993)). To determine whether a witness's statement is improper opinion testimony on the defendant's guilt, we consider the specific circumstances of the case, including the type of witnesses involved, the nature of the testimony, the nature of the charges, the type of defense, and other evidence before the trier of fact. *Demery*, 144 Wn.2d at 759 (quoting

15

*Heatley*, 70 Wn. App. at 579). However, opinion testimony is not improper if it "is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the [fact finder], and is based on inferences from the evidence." *Heatley*, 70 Wn. App. at 578.

Under the circumstances of this case, Mr. Lindsley's testimony was not an opinion about Mr. Markwell's guilt. Mr. Lindsley was called by the State to explain how Mr. Hopkins might perceive threats and why he might be vulnerable to exploitation. His testimony regarding Mr. Hopkins's low intellectual functioning, arrested emotional development, and vulnerability to manipulation helped the jurors understand Mr. Hopkins's testimony and his reactions to Mr. Markwell. Mr. Lindsley did not express any opinion as to Mr. Markwell's guilt or credibility. He merely conveyed his opinion that Mr. Hopkins was vulnerable to exploitation.

Finally, Mr. Markwell contends that Mr. Lindsley's opinion lacks an adequate scientific foundation. However, defense counsel did not object to the expert qualifications or to the foundation of his testimony. Because this issue is being raised for the first time on appeal and is not of constitutional magnitude, we do not address it. *State v. Mak*, 105 Wn.2d 692, 719, 718 P.2d 407 (1986) (quoting *State v. Ferguson*, 100 Wn.2d 131, 138, 667 P.2d 68 (1983)).

16

*Prosecutorial Misconduct.* Next, Mr. Markwell raises a series of prosecutorial misconduct claims on appeal, including that the prosecutor (1) asked leading questions despite the trial court's admonition, (2) elicited inadmissible evidence from a witness, (3) improperly vouched for Mr. Hopkins's credibility, (4) impugned defense counsel, (5) misstated the law of reasonable doubt, and (6) improperly used the American flag in a power point presentation.

To prevail on his prosecutorial misconduct claims, Mr. Markwell must show both improper conduct and resulting prejudice. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). A prosecutor's comments are prejudicial when they are substantially likely to affect the jury's verdict. *McKenzie*, 157 Wn.2d at 52 (quoting *Brown*, 132 Wn.2d at 561). When determining the prejudicial effect of the conduct, we look to the context of the entire argument, the issues of the case, the evidence, and the jury instructions. *Brown*, 132 Wn.2d at 561.

We do not reverse when the trial court could have corrected a prosecutor's improper remark by a curative instruction that defense counsel failed to make. *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991). If defense counsel fails to object to improper remarks by the prosecutor, the error is waived on appeal "unless the remark is

17

deemed to be so flagrant and ill intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Id.*

Mr. Markwell first contends that the prosecutor's use of leading questions tainted the trial, improperly prompting Mr. Hopkins to testify that force was used against him. A leading question is one that suggests the answer desired. *State v. Scott*, 20 Wn.2d 696, 698, 149 P.2d 152 (1944). ER 611(c) provides that leading questions "should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." While the asking of leading questions is not usually reversible error, "the persistent pursuit of such a course of action is a factor to be added in the balance." *State v. Torres*, 16 Wn. App. 254, 258, 554 P.2d 1069 (1976).

Although Mr. Markwell suggests that the trial was permeated with leading questions, he identifies a single instance where a leading question was used. During trial, the prosecutor asked Mr. Hopkins: "You said earlier that he forced oral sex; how did he force oral sex?" RP at 387. The court sustained defense counsel's objection and asked the prosecutor to restate the question. Even if we deem this a leading question, there is no suggestion that it had an appreciable effect on the verdict. Additionally, just prior to the prosecutor's question, Mr. Hopkins had testified, without prompting, that Mr. Markwell had forced him to perform oral sex. In view of this testimony and the evidence of Mr.

18

Markwell's guilt, it is not likely the verdict hinged on any information presented by the prosecutor.

As to the prosecutor's use of "speaking objections," Mr. Markwell points to two examples in the record where these occurred. In the first, defense counsel objected to the State's objection to defense counsel's cross-examination of Mr. Lindsley as prejudicial to the victim. However, defense counsel did not go forward with argument on the issue and ended its questioning of the witness. In the next instance, defense counsel objected to the State's following objection, "I am still objecting to all of this. I think if nothing else, under the rape shield law. I mean it does not matter whether or not the victim has had previous . . . ." RP at 286. Even if we deem these objections improper, Mr. Markwell fails to articulate how they prejudiced him. While the prosecutor objected that defense questioning was improper under the rape shield statute, nothing prejudicial was introduced through argument or opinion prior to the court excusing the jury.

Next, Mr. Markwell contends the prosecutor committed reversible misconduct when, in violation of a pretrial ruling, he elicited testimony from Mr. Warren about Mr. Markwell shooting someone in the foot:

> [Prosecutor]: Defendant told a number of stories, correct?
> [Mr. Warren]: Yes.
> [Prosecutor]: And what was included in those stories?
> [Mr. Warren]: Violence.

19

[Prosecutor]: What do you mean?
[Mr. Warren]: Talking about one story where he shot a guy in the foot.

RP at 523.

During trial, the court prohibited witnesses from testifying about Mr. Markwell's prior bad acts. Even assuming Mr. Warren's testimony violated this ruling, that fact does not establish that the prosecutor committed misconduct. Mr. Markwell does not demonstrate, nor does the record suggest, that the prosecutor's question was ill-intentioned or designed to elicit a response violating the court's ruling. The trial court sustained defense counsel's objection and immediately instructed the jury to disregard the remark. We presume a jury follows the court's instructions. *State v. Studebaker*, 67 Wn.2d 980, 983-84, 410 P.2d 913 (1966). And given the strength of the State's case, there is no reasonable probability that Mr. Warren's reference to his conversation with Mr. Markwell about an alleged shooting affected the outcome of the trial.

The next incident cited by Mr. Markwell occurred during closing argument, when the prosecuting attorney, referencing Mr. Lindsley's testimony, argued "male victims typically don't disclose rape right away, and because it is threatening to a man to have to admit that he has been sexually abused." RP at 585. Mr. Markwell contends this comment constituted improper vouching for Mr. Hopkins's credibility.

20

Beyond this bare argument, Mr. Markwell fails to explain how the prosecutor's argument constituted improper vouching. Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Here, the prosecutor never personally vouched for the credibility of Mr. Hopkins, but merely highlighted Mr. Lindsley's testimony in asking the jury to evaluate Mr. Hopkins's testimony. In doing so, he explained the jury instruction on expert witnesses, reviewed part of Mr. Lindsley's testimony, and asked the jury to consider Mr. Hopkins's testimony in conjunction with Mr. Lindsley's. Prosecutors have wide latitude to argue reasonable inferences from the facts concerning witness credibility. *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). Additionally, the jury was instructed it was not required to accept the opinion of the expert witness, and the jury is presumed to follow the instruction.

Mr. Markwell also maintains that in closing argument the prosecuting attorney improperly impugned defense counsel by referring to him as a "dominant" and "aggressive" attorney. He argues, "[a] prosecutor may not launch unfounded attacks impugning the character of defense counsel and imply the defense case is improper." Appellant's Br. at 32. He claims that linking defense counsel to Mr. Markwell implied

21

that defense counsel was also victimizing Mr. Hopkins and thereby compromised Mr. Markwell's right to counsel.

During closing, the prosecutor stated: "When [Mr. Hopkins] was questioned by a dominant appearing, maybe aggressive type defense attorney, didn't it seem like every answer was yes." RP at 585. Evaluating this comment in the context of the closing argument, Mr. Markwell fails to establish that it was an attack on defense counsel. Here, the challenged statement was made in the context of discussing the jury instruction related to witness credibility. The prosecutor directed the jury to recall the "manner" of Mr. Hopkins while he testified and recalled Mr. Lindsley's testimony regarding Mr. Hopkins's difficulty standing up to dominant individuals. RP at 582. The prosecutor was simply asking the jury to weigh Mr. Lindsley's testimony in conjunction with its observations of Mr. Hopkins's manner of testifying in response to questioning by defense counsel. This was not misconduct.

Relying on *State v. Warren*, 165 Wn.2d 17, 195 P.3d 940 (2008), Mr. Markwell next contends the prosecutor misstated the law on reasonable doubt. While discussing the "reasonable doubt" instruction, the prosecutor explained:

22

It means if you have a real doubt as to whether or not these things occurred, then the defendant is not guilty—but it does not mean that you have to be persuaded beyond all doubt. It does not mean 100 percent certainty; as the jury instruction says, very few things are none [sic] with 100 percent certainty.

RP at 587. The court sustained defense counsel's objection and instructed the jury to disregard the statement.

However, *Warren* is distinguishable. In that case, our Supreme Court held that the State undermined the presumption of innocence by stating, "'Reasonable doubt does not mean give the defendant the benefit of the doubt.'" *Warren*, 165 Wn.2d at 24. In contrast to *Warren*, the prosecutor here did not state that Mr. Markwell was not entitled to the benefit of any doubt, he stated that the jury did not have to be 100 percent certain the defendant was guilty. However, even if we conclude that the prosecution committed misconduct by misstating the burden of proof, the misstatement was cured by a proper instruction. In *Warren*, the court held that the instructions cured any misstatements of the law. Here, the court directed the jury to disregard the prosecutor's comment and gave a correct reasonable doubt instruction. This eliminated any confusion and potential prejudice stemming from any improper statement.

Finally, Mr. Markwell contends that the prosecutor's use of the flag in his power point presentation improperly invited an emotional verdict by conveying to the jurors

23

"that voting for the prosecution was their patriotic duty." Appellant's Br. at 34. Mr. Markwell's argument fails. Nothing in the record indicates that the prosecutor made any remarks about the flag or what it should mean to the jury. Mr. Markwell points to no evidence that the prosecutor inflamed the jurors' passions or prejudices by referencing the flag. There was no misconduct.

*Motion for Mistrial.* A mistrial should only be granted based on a witness's inadmissible testimony if the defendant is so prejudiced by the testimony that nothing short of a new trial would ensure that he receive a fair trial. *State v. Escalona*, 49 Wn. App. 251, 254, 742 P.2d 190 (1987). We will overturn a denial of a motion for a mistrial if there is a substantial likelihood that the inadmissible evidence affected the jury's verdict. *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Thus, we must determine whether Mr. Warren's testimony in violation of the motion in limine was so prejudicial that Mr. Markwell was denied his right to a fair trial. In making this determination, we consider: (1) the seriousness of the trial irregularity, (2) whether it was cumulative of other properly admitted evidence, and (3) whether the trial court properly instructed the jury to disregard it. *Escalona*, 49 Wn. App. at 254. As previously noted, jurors are presumed to follow the trial court's limiting instruction. *State v. Johnson*, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

24

The decision to grant or deny a mistrial is within the sound discretion of the trial court and is reversible only for an abuse of that discretion. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *Id.* (quoting *Stenson*, 132 Wn.2d at 701). When making this determination, appellate courts do not weigh conflicting evidence or make credibility determinations. *State v. Rodriguez*, 103 Wn. App. 693, 696, 699-700, 14 P.3d 157 (2000), *aff'd*, 146 Wn.2d 260, 45 P.3d 541 (2002). Our inquiry is limited to whether the trial court had tenable reasons for concluding that Mr. Markwell was not prejudiced by the improper testimony. *Id.* at 700.

Before trial, Mr. Markwell moved to exclude Mr. Warren's testimony regarding conversations with Mr. Markwell as inadmissible hearsay and character evidence. Defense counsel specifically asked for the suppression of comments that Mr. Markwell made about drug use to Mr. Warren. The State countered that Mr. Warren directly observed Mr. Markwell and Mr. Hopkins interact and that his testimony was relevant to establishing the underlying element of an implied threat. The prosecutor explained that the purpose of introducing Mr. Warren's testimony was not to show that Mr. Markwell used drugs, but to show a common scheme of grooming inmates for sex. He also pointed out that Mr. Markwell's stories of his violent behavior provided background for the

25

existence of the implied threat. The court denied the motion to exclude, finding Mr.

Warren's testimony relevant to the issue of consent:

> The issue of whether or not there was any coercion, whether or not there was any intimidation, all of this is fair game, is highly relevant, and these comments that the defendant is alleged to have made to show his bravado or macho or whatever, to somebody, allegedly, of less than average intelligence . . . the door is open for that to come in.

RP at 317.

Later, when the prosecutor asked Mr. Warren to describe the substance of his

conversations with Mr. Markwell, Mr. Warren testified that Mr. Markwell told stories of

drug use and "[v]iolence," including one story where he stated that he "shot a guy in the

foot." RP at 523.

Mr. Markwell objected and moved for a mistrial, contending that the prosecutor

asked the question in bad faith and that an instruction could not cure the error. The

prosecutor responded that his understanding of the pretrial rulings was that he would be

allowed to question witnesses about Mr. Markwell's stories of violence. He also stated

that he had not anticipated that Mr. Warren would testify about Mr. Markwell's stories of

drug use or shooting someone in the foot. The court denied the motion for a mistrial, but

instructed the jury to disregard Mr. Warren's last two statements.

26

Mr. Markwell claims that *Escalona* supports his argument that Mr. Warren's surprise testimony is grounds for a mistrial. In that case, a prosecution for second degree assault with a knife, the trial court granted a defense motion to exclude evidence of the defendant's prior conviction for the same crime. *Escalona*, 49 Wn. App. at 252. During cross-examination, the victim disclosed that he knew the defendant "'already has a record and had stabbed someone.'" *Id.* at 253. The trial court struck the improper testimony and instructed the jury not to consider it, but denied the defense's motion for a mistrial. On appeal, Division One of this court concluded that improper testimony that the defendant had previously committed the same crime as the one charged was highly prejudicial and that a curative instruction could not negate the prejudicial effect. *Id.* at 256.

*Escalona* is distinguishable. The improper statement at issue in that case indicated that the defendant had committed a virtually identical crime to the one for which he was on trial. Thus, the statement was highly prejudicial because it was highly likely that jurors would conclude that the defendant had a propensity for committing that type of crime. In this case, in contrast, the improper testimony indicated that Mr. Markwell made statements in jail about drug use and allegedly shooting someone in the foot. Even if true, these statements do not indicate a propensity to commit rape. Moreover, the unexpected

27

testimony was in line with the State's general theory of the case that Mr. Markwell was creating an atmosphere of fear and intimidation within the jail. As such, it was cumulative of Mr. Hopkins's and Mr. Burke's testimony about Mr. Markwell's stories of violence. Finally, the jury was instructed to disregard inadmissible testimony. Thus, although the remarks had the potential for prejudice, they were not so serious as to warrant a mistrial.

The trial court did not err in denying Mr. Markwell's motion for a mistrial.

*Cumulative Error.* Mr. Markwell's contention that he was denied a fair trial due to cumulative error fails. Under the cumulative error doctrine, a defendant may be entitled to a new trial when errors cumulatively produced a trial that was fundamentally unfair. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary. *Id.* Where no prejudicial error is shown to have occurred, cumulative error cannot be said to have deprived the defendant of a fair trial. *State v. Stevens*, 58 Wn. App. 478, 498, 794 P.2d 38 (1990). Without evidence of error here, the cumulative error doctrine does not apply.

28

No. 31167-8-III
*State v. Markwell*

We affirm the convictions for three counts of second degree rape.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Kulik, J.

WE CONCUR:

_____        _____
Korsmo, C.J.                                                    Siddoway, J.